| | | |
|---|---|---|
| DONALD LANDOLT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV 695 JCH(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Donald Landolt for Supplemental Security Income under Title XVI of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 17).

## Procedural History

On June 13, 2005, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on June 1, 1997. (Tr. 49). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 13, 2008. (Tr. 32, 9-19). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security

Administration (SSA), which was denied on February 24, 2010. (Tr. 4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's administrative hearing was held on August 21, 2007. (Tr. 306). Plaintiff was present and was represented by counsel. (Tr. 28). The ALJ began the hearing by admitting the exhibits into evidence. (Id.). The ALJ indicated that he would leave the record open for thirty days following the hearing so that plaintiff could obtain additional medical records. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he lived in a downstairs apartment in the home of a family friend. (Tr. 307). Plaintiff stated that he did not pay rent, although he helped with chores such as taking the trash out. (Id.). Plaintiff testified that he did not have medical insurance. (Id.). Plaintiff stated that he last received Medicaid benefits two years prior to the hearing. (Tr. 308). Plaintiff testified that he received food stamps. (Id.).

Plaintiff stated that he attended school until the eighth grade and that he did not complete the eighth grade. (Id.). Plaintiff testified that he was in the special education program at one time. (Id.). Plaintiff stated that he was able to read very little of the daily newspaper. (Id.). Plaintiff testified that he was only able to read small advertisements, and that he mostly just looked at pictures. (Id.). Plaintiff stated that he attempted to obtain his GED in 2002, but he did not get far. (Tr. 308-09).

Plaintiff testified that he last worked in 2003, at a position cutting grass. (Tr. 309). Plaintiff stated that he worked at this position for less than a month before he was laid off. (Id.).

Plaintiff testified that he did not recall the last time he worked prior to this position, although he estimated that it was about two years. (Id.). Plaintiff stated that he was incarcerated from about 1998 to 2003. (Id.). Plaintiff testified that he worked at a position cutting grass prior to his incarceration. (Id.). Plaintiff stated that he did not work at any other positions in the 1990s or since that time. (Tr. 310).

Plaintiff testified that he is unable to work because he has difficulty getting along with people. (Id.). Plaintiff stated that he especially has difficulty taking orders. (Id.).

Plaintiff testified that he experiences anxiety attacks and panic attacks. (Id.). Plaintiff stated that, when he has an anxiety attack, his heart starts beating fast and he becomes dizzy. (Id.). Plaintiff testified that, during a panic attack, he experiences racing thoughts, experiences chest pains, becomes upset, and does not want to be around people. (Id.). Plaintiff stated that he experiences panic attacks about every other day. (Id.).

Plaintiff testified that he has difficulty being in crowds of people and that he does not like going to stores. (Id.). Plaintiff stated that he starts feeling crowded when two to three people are around him. (Tr. 311).

Plaintiff testified that he experiences "deep depression." (Id.). Plaintiff stated that when he is depressed, he does not talk to anyone and finds a place where he can be alone. (Id.).

Plaintiff testified that he experiences difficulty concentrating. (Id.). Plaintiff stated that he finds it difficult to watch movies and television shows. (Id.). Plaintiff testified that he experiences difficulty remembering things such as appointments. (Id.). Plaintiff stated that his landlady occasionally reminds him of appointments. (Tr. 312).

Plaintiff testified that he experiences crying spells daily. (Id.). Plaintiff stated that he has

talked to a psychiatrist about his issues.  (Id.).  Plaintiff testified that he last saw a psychiatrist in June of 2007 at Barnes Hospital.  (Id.).

Plaintiff stated that he was not receiving Medicaid benefits at the time of the hearing, although he was trying to obtain benefits.  (Id.).

Plaintiff testified that he had seen one other psychiatrist in 2005, Dr. Tandon.  (Tr. 313). Plaintiff stated that he was not taking any psychiatric medication at the time of the hearing because his prescription ran out.  (Id.).  Plaintiff testified that he has taken the following medications in the past: Trazodone,[1] Paxil,[2] Vistaril,[3] Risperdal,[4] Depakote,[5] Cogentin,[6] Doxepin,[7]

_____

[1]Trazodone is an antidepressant indicated for the treatment of depression.  See Physician's Desk Reference (PDR), 3296 (59th Ed. 2005).

[2]Paxil is a psychotropic drug indicated for the treatment of depression and anxiety.  See PDR at 1585-86.

[3]Vistaril is indicated for the treatment of anxiety.  See WebMD, http://www.webmd.com/drugs (last visited May 23, 2011).

[4]Risperdal is indicated for the treatment of schizophrenia.  See PDR at 1742.

[5]Depakote is indicated for the treatment of the manic episodes associated with bipolar disorder.  See PDR at 437.

[6]Cogentin is indicated for the treatment of parkinsonism.  See PDR at 2007.

[7]Doxepin is indicated for the treatment of depression and anxiety.  See WebMD, http://www.webmd.com/drugs (last visited May 23, 2011).

Thorazine,[8] "Milareu,"[9] and Nubain.[10]  (Id.).

Plaintiff stated that he experiences difficulty sleeping at night and that he usually only sleeps about two hours a night.  (Tr. 314).  Plaintiff testified that he does not take naps during the day.  (Id.).

Plaintiff stated that he does not drive and that he does not have a driver's license.  (Id.).

Plaintiff testified that he does his own grocery shopping.  (Id.).  Plaintiff stated that he shops about once a week and that it usually takes him about a half-hour.  (Id.).  Plaintiff testified that he occasionally experiences difficulty in the grocery store where he drops things, gets anxious, and must leave before he is finished shopping.  (Id.).  Plaintiff stated that this occurs about once a month.  (Id.).

Plaintiff testified that he attends AA meetings once a week.  (Tr. 315).  Plaintiff stated that he does not have an AA sponsor because he does not feel comfortable with anyone.  (Id.).  Plaintiff testified that he last drank on April 3, 2006.  (Id.).  Plaintiff stated that he last used street drugs in approximately 1975.  (Id.).

The ALJ then examined plaintiff, who testified that, at the time of the hearing, he was only taking blood pressure medication.  (Id.).  Plaintiff stated that a social worker at Barnes Hospital enrolled him in a program through which he receives the medication at no cost.  (Id.).  Plaintiff

---

[8]Thorazine is indicated for the treatment of mood disorders including schizophrenia, psychotic disorders, and the manic phase of bipolar disorder.  See WebMD, http://www.webmd.com/drugs (last visited May 23, 2011).

[9]The transcript indicates that this is a phonetic spelling.  No such drug exists.

[10]Nubain is an analgesic indicated for the relief of moderate to severe pain.  See PDR at 1220.

testified that he saw a psychiatrist in June of 2007. (Id.). Plaintiff stated that he has also seen a social worker. (Id.).

**B.    Vocational Expert Evidence**

James Israel, vocational expert, completed interrogatories sent to him by both the ALJ and plaintiff's attorney. (Tr. 107-09). Mr. Israel described plaintiff's past work as lawn care-unskilled, light; labor-unskilled, medium; and various short-term jobs, no transferable skills. (Tr. 107). Mr. Israel noted that plaintiff's unskilled-labor-based jobs require physical strength and a very short learning period. (Id.). Mr. Israel was instructed to assume an individual of plaintiff's age, education and work experience who is limited to low stress, routine tasks, with no social interaction as a critical job element. (Tr. 108). Mr. Israel stated that such an individual could perform plaintiff's past work as a lawn care worker, and some labor duties in other jobs. (Id.). He noted that, while plaintiff's prior jobs required contact with others, it is not a critical job element to performance of these duties. (Id.). Plaintiff's attorney asked Mr. Israel to assume an individual who is markedly impaired in his ability to sustain concentration and attention; and markedly impaired in his ability to cope with the stress and pressures of routine work activities. (Tr. 109). Mr. Israel stated that such an individual would be unable to sustain a job. (Id.).

**C.    Relevant Medical Records**

The record reveals that plaintiff received treatment at the Algoa Correctional Center during his incarceration, from January 2001 through August 2003. (Tr. 114-215). Plaintiff was treated for

hypertension,[11] non-insulin-dependent diabetes,[12] GERD,[13] and various other physical complaints. (Id.). Plaintiff was also prescribed Doxepin and Navane[14] for psychiatric complaints. (Tr. 135).

Plaintiff saw Kenneth G. Mayfield, Licensed Psychologist, on August 25, 2004, for a psychological evaluation at the request of the state agency. (Tr. 218-21). Dr. Mayfield noted that plaintiff had a lengthy history of alcohol abuse and was incarcerated for approximately ten years as a result of two felony convictions. (Tr. 220). Dr. Mayfield stated that plaintiff was diagnosed with schizoaffective disorder[15] and antisocial personality disorder[16] during his most recent incarceration. (Id.). Plaintiff reported that he had been unable to afford prescription refills since his release from prison approximately one year prior. (Tr. 219). Dr. Mayfield diagnosed plaintiff with schizoaffective disorder by history, antisocial personality disorder by history and assessed a GAF[17] score of 50.[18] (Tr.

---

[11]High blood pressure. Stedman's Medical Dictionary, 927 (28th Ed. 2006).

[12]A condition characterized by high blood glucose levels caused by either a lack of insulin or the body's inability to use insulin efficiently. It develops most often in middle-aged and older adults but can appear in young people. Stedman's at 530.

[13]Gastroesophageal reflux disease, or "GERD," is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

[14]Navane is indicated for the treatment of schizophrenia. See WebMD, http://www.webmd.com/drugs (last visited May 23, 2011).

[15]An illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia. In the absence of a major depressive, manic, or mixed episode, there must be delusions or hallucinations of several weeks. Stedman's at 570.

[16]An enduring and pervasive pattern characterized by continuous and chronic antisocial behavior with disregard for and violation of the rights and safety of others, beginning before the age of 15. Stedman's at 567.

[17]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a

221).  Intellectual testing revealed a Verbal Score IQ of 61, Performance Score IQ of 63, and Full Scale IQ of 58.[19]  (Tr. 220).  Dr. Mayfield found that plaintiff appeared to exert valid effort during his assessment and that the test results were reflective of his functional intellectual abilities.  (Id.).  Dr. Mayfield stated that plaintiff's level of daily functioning reveals that plaintiff's ability to relate to others is borderline.  (Tr. 221).  He noted that there were indications of considerable social isolation and constriction of interests and habits.  (Id.).  Dr. Mayfield stated that plaintiff is able to care for his basic personal needs and is able to understand and follow verbal directions, but his capacity for sustained concentration and attention is markedly impaired.  (Id.).  Dr. Mayfield expressed the opinion that plaintiff's ability to cope with stress and pressures of routine work activities appears markedly impaired.  (Id.).  Finally, Dr. Mayfield found that plaintiff was "borderline capable" of comprehending and following basic personal and financial affairs.  (Id.).  He noted that plaintiff was in need of renewed psychiatric treatment.  (Id.).

On December 1, 2004, plaintiff presented to Claire Kenneally at Barnes-Jewish Hospital psychiatric clinic with complaints of depression.  (Tr. 225).  Dr. Kenneally diagnosed plaintiff with history of bipolar disorder[20] and anti-social personality disorder.  (Id.).  She scheduled a follow-up

---

hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[18]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

[19]Mild mental retardation is characterized by an IQ score of 50-55 to approximately 70.  See DSM IV at 40.

[20]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's at 568.

appointment for plaintiff. (Id.).

On December 9, 2004, plaintiff was admitted to Parkland Health Center, where he was treated by David Mullen, DO. (Tr. 227). Dr. Mullen diagnosed plaintiff with bipolar disorder with mania/hypomania. (Id.). Dr. Mullen stated that plaintiff seemed to be in a "hypomanic or agitated insomnia phase." (Id.). He prescribed "medication to stabilize the highs and agitation and to allow sleep and increase appetite." (Id.).

Plaintiff saw Dr. Tandon at Barnes-Jewish Hospital psychiatric clinic on January 7, 2005. (Tr. 224). Dr. Tandon[21] prescribed Zyprexa[22] and Doxepin. (Id.).

Plaintiff saw Dr. Tandon on January 21, 2005, at which time he continued plaintiff on his medication regimen, and transferred plaintiff to BJC Behavioral Health in Farmington, Missouri. (Id.).

Plaintiff presented to BJC Behavioral Health on March 22, 2005, for an initial assessment. (Tr. 232).[23] Plaintiff reported that he was depressed and nervous and that he was out of medication. (Id.). Plaintiff also reported hearing voices at times that tell him to "end it."" (Tr. 238). Plaintiff's affect was flat during his interview. (Id.). Plaintiff reported that he completed the seventh grade and that he was in regular classes because his mother would not allow him to be moved into special education classes. (Id.). It was noted that plaintiff appeared to have suffered from his symptoms of mental illness for many years. (Tr. 240). Plaintiff had a history of poor judgment with some of his

---

[21]Dr. Tandon's first name is not provided in the record.

[22]Zyprexa is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder. See PDR at 1900.

[23]This assessment does not identify the examining physician.

decisions causing him to be incarcerated. (Id.). Plaintiff also had a history of suicide attempts. (Id.). Plaintiff was unable to provide for himself as he had no income and was reliant on others for his basic needs and transportation. (Id.). Plaintiff was guarded in his responses to many of the questions, so it was unclear if he provided all of the required information regarding his symptoms. (Id.). Plaintiff was receiving treatment for his symptoms from a primary care physician in St. Louis and it was not known if plaintiff was compliant with treatment. (Id.). Plaintiff was diagnosed with schizoaffective disorder, depressed type; rule out personality disorder NOS with antisocial traits; and a GAF score of 55.[24] (Id.). Plaintiff's intellect was estimated to be "below average." (Id.).

On May 2, 2005, plaintiff saw Dr. Zenaida Servando, a psychiatrist at BJC Behavioral Health. (Tr. 242). Plaintiff indicated that he needed medication. (Id.). Dr. Servando diagnosed plaintiff with depressive disorder NOS and history of polysubstance abuse, and antisocial personality, and assessed a GAF score of 60.[25] (Id.).

On May 19, 2005, Dr. Servando found that plaintiff's affect was appropriate, his mood was fair, his judgment was poor, his intellect was low average, and his insight was adequate. (Tr. 248). Plaintiff admitted to experiencing hallucinations. (Id.). Dr. Servando's assessment was depressive disorder, with a GAF score of 60. (Id.). He prescribed Seroquel[26] for "anxiety, irritability and compulsive behavior." (Id.).

---

[24]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[26]Seroquel is a psychotropic drug indicated for the treatment of bipolar mania and schizophrenia. See PDR at 663.

On June 17, 2005, plaintiff reported improved sleep and appetite, no hallucinations, and indicated that the Seroquel was working. (Tr. 249). Plaintiff was guarded, cooperative, logical and goal-directed. (Id.). Dr. Servando continued the Seroquel. (Id.).

On July 18, 2005, plaintiff reported improved sleep patterns and that he no longer hears voices telling him to hurt himself. (Tr. 264). Plaintiff indicated that he likes to go fishing but had no one to accompany him. (Id.). Plaintiff was pleasant and cooperative, his affect was appropriate, and his thought process was logical and goal-directed. (Tr. 263). Dr. Servando strongly admonished plaintiff to maintain sobriety from alcohol and drugs, and continued him on Seroquel for sleep, anxiety and hallucinations. (Id.).

On August 29, 2005, plaintiff complained of feeling anxious and restless. (Id.). Plaintiff reported that his application for disability benefits was denied. (Id.). Dr. Servando noted that plaintiff was inconsistent at times. (Id.). Plaintiff described his mood as sad, although Dr. Servando noted that his demeanor was not consistent with a sad affect. (Tr. 262). Plaintiff complained of depression but noted that he would go fishing if he had transportation and a friend to join him. (Id.). Dr. Servando continued the Seroquel. (Id.).

Plaintiff saw Phillip R. Cummings, RN, MSN, FNP, on September 8, 2005, with complaints of cold symptoms. (Tr. 255). Plaintiff reported a long history of depression. (Id.). Mr. Cummings' assessment was upper respiratory infection, hypertension, and depression. (Id.). Mr. Cummings prescribed medication for plaintiff's hypertension. (Id.). On September 22, 2005, plaintiff reported that his upper respiratory infection symptoms had resolved and that he was feeling pretty good. (Tr. 254). Plaintiff reported difficulty sleeping and requested additional medications. (Id.). Mr. Cummings' assessment was hypertension, controlled; upper respiratory infection, resolved; and

insomnia.  (Id.).  He prescribed Vistaril for plaintiff's sleep issues.  (Id.).  On October 27, 2005, plaintiff presented to Mr. Cummings for treatment of viral gastroenteritis.[27]  (Tr. 253).

On November 11, 2005, plaintiff reported difficulty sleeping at night and that he had become suicidal because he could not sleep.  (Tr. 262).  Dr. Servando noted that plaintiff contradicted himself at one point.  (Id.).  Dr. Servando increased plaintiff's dosage of Seroquel.  (Id.).

On December 9, 2005, plaintiff reported that he was doing better since his Seroquel had been increased.  (Tr. 261).  Plaintiff was cheerful and indicated that he was feeling good.  (Id.).

On February 3, 2006, plaintiff reported that he was nervous and requested medication.  (Tr. 260).  Dr. Servando prescribed Buspar.[28]  (Id.).

On March 17, 2006, plaintiff reported that he was about the same.  (Tr. 258).

On April 26, 2006, plaintiff reported that the Seroquel helped with his sleep and anxiety level.  (Tr. 259).  Plaintiff indicated that the Buspar did not help at all so he stopped taking it.  (Id.).

On June 5, 2006, plaintiff reported that his Medicaid benefits were taken away on May 18, 2006.  (Tr. 259).  Plaintiff indicated that he was on probation for two years due to his third DWI conviction.  (Id.).  Dr. Servando informed plaintiff that he was reluctant to prescribed Seroquel if plaintiff was drinking.  (Tr. 256).  Plaintiff became irate and left the room screaming.  (Id.).  Dr. Servando indicated that he was requesting termination of treatment due to non-compliance.  (Id.).

Plaintiff presented to Barnes-Jewish Hospital clinic on June 6, 2007, for evaluation of psychiatric symptoms.  (Tr. 296).  Plaintiff reported extensive depressive symptoms interspersed with

---

[27]Inflammation of the mucous membrane of both the stomach and intestine.  Stedman's at 791.

[28]Buspar is indicated for the treatment of anxiety.  See WebMD, http://www.webmd.com/drugs (last visited May 23, 2011).

pressured thoughts and the inability to sleep. (Id.). Plaintiff indicated that he had been off all medications for one year. (Id.). Plaintiff reported experiencing some suicidal thoughts without intention or plan. (Id.). Dr. Kenneally prescribed Doxepin for plaintiff's bipolar disorder. (Id.).

In a letter dated September 13, 2007, Les Bagwell, substance abuse counselor, indicated that plaintiff had been attending counseling sessions and was participating in group sessions. (Tr. 292). Plaintiff's treatment plan focused on chemical substance abuse, relapse prevention, and legal and mental issues. (Id.).

Joan Singer, Ph.D. completed a Mental Residual Functional Capacity Assessment on August 16, 2005. (Tr. 273-75). Dr. Singer expressed the opinion that plaintiff had moderate limitations in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. (Tr. 274). Dr. Singer also completed a Psychiatric Review Technique. (Tr. 277-89). Dr. Singer found that plaintiff's depressive disorder NOS, history of schizoaffective diagnosis, antisocial personality disorder, and history of polysubstance abuse did not precisely satisfy diagnostic criteria. (Id.). Dr. Singer expressed the opinion that plaintiff's impairments caused mild limitations in plaintiff's activities of daily living; and moderate limitations in plaintiff's ability to maintain social functioning and ability to maintain concentration, persistence, or pace. (Tr. 287). Dr. Singer found that plaintiff's IQ scores obtained in August 2004 were inconsistent with plaintiff's adaptive functioning. (Tr. 289). Dr. Singer stated that the preponderance of the evidence indicates plaintiff

functions in at least the low average range of intelligence. (Id.). Dr. Singer expressed the opinion that plaintiff was capable of performing at least simple repetitive tasks on a routine basis and that plaintiff would do best in relatively low stress jobs with minimal interpersonal contact. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since June 13, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq*.).

2. The claimant has the following severe impairments: an anti-social personality disorder, a bipolar disorder, a history of poly substance abuse, and low average intellectual functioning (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but nonexertionally requires low stress and routine tasks with no social interaction as a critical job element.

5. The claimant has worked as a grass cutter and laborer though it does not appear that he has performed such work at a substantial and gainful level since 1993 or in the last 15 years. This precludes a finding that he has any past relevant work and causes a shift in the burden of proof from the claimant to the Administration (20 CFR 416.965).

6. The claimant was born on January 6, 1956 and was 49 years old, which is defined as a younger individual, on the date the current application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work as concluded by the vocational expert James Israel, C.R.C., in his answers to interrogatories dated January 2008 (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 13, 2005, the date the application was filed (20 CFR 416.920(g)).

(Tr. 14-18).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on June 13, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 19).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The

analysis required has been described as a "searching inquiry."  Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See</u> <u>id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See</u> <u>id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. <u>See</u> <u>id.</u> Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).

If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claim

Plaintiff argues that the ALJ erred in finding that plaintiff did not meet Listing 12.05(B) or

(C). Specifically, plaintiff contends that the ALJ erred in giving little weight to the IQ scores obtained at the August 25, 2004 consultative examination with Dr. Mayfield.

Listing 12.05 provides as follows:

> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ***
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05. "The requirements in the introductory paragraph of Listing 12.05] are mandatory." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

The ALJ specifically addressed Listing 12.05, and found that plaintiff did not have an impairment that met or medically equaled this Listing. (Tr. 14). The ALJ found that the IQ scores obtained by Dr. Mayfield in August 2004 were inconsistent with plaintiff's adaptive functioning and were obtained when plaintiff was not taking any psychotropic medication. (Id.). The ALJ indicated that he was giving little weight to these scores, as previously determined by state agency physicians. (Id.). The ALJ stated that the preponderance of the evidence indicates that plaintiff functions in at least a low average range of intelligence, particularly when compliant with medical care. (Id.). He noted that plaintiff has a driver's license, has worked at a substantial and gainful level in the past, has legibly and concisely completed multiple reports in the record,

and testified that he cares for his own needs and performs tasks around the house. (Id.). The ALJ pointed out that plaintiff was described as being of low average intellect in May 2005. (Id.). Finally, the ALJ stated that plaintiff presented clear and logical testimony and was a good historian at the hearing. (Id.).

"'[A]n ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior.'" Christner v. Astrue, 498 F.3d 790, 794 (8th Cir. 2007) (quoting Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001)); accord Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005)). "Indeed, test results of this sort should be examined 'to assure consistency with daily activities and behavior.'" Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998) (quoting Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

At issue are the IQ scores obtained by Dr. Mayfield, a non-treating psychologist, in an August 2004 psychological evaluation. (Tr. 218-21). Dr. Mayfield administered the Wechsler Adult Intelligence Scale-III Edition, which revealed a Verbal Score IQ of 61, Performance Score IQ of 63, and Full Scale Score IQ of 58. (Tr. 220). These scores place plaintiff in the range set out in Listing 12.05. Dr. Mayfield found that plaintiff appeared to exert valid effort during the assessment and that the test results appeared reflective of his functional intellectual abilities. (Id.).

The undersigned finds that the ALJ articulated sufficient reasons for assigning little weight to the IQ scores obtained by Dr. Mayfield. The ALJ found that the scores were inconsistent with the record as a whole. The ALJ first noted that the scores were obtained when plaintiff was not taking any psychotropic medication and that plaintiff functions in at least a low average range of

intelligence, particularly when compliant with medical care. This finding is supported by the record.

The medical record does not support the low IQ scores obtained by Dr. Mayfield. Notably, plaintiff reported to Dr. Mayfield that he had been off of his psychiatric medications for approximately one year. (Tr. 219). On a March 22, 2005, initial assessment at BJC Behavioral Health Services, plaintiff's intellect was described as "below average," rather than "borderline," or "mentally retarded." (Tr. 240). On May 19, 2005, Dr. Servando found that plaintiff's intellect was "low average." (Tr. 248). None of plaintiff's treating mental health providers diagnosed plaintiff with borderline intellectual functioning or mental retardation, or otherwise indicated that they suspected the presence of an intellectual impairment. State agency psychologist Dr. Singer found that plaintiff functioned in "at least the low average range of intelligence." (Tr. 289).

The ALJ also found that plaintiff did not have the deficits in adaptive functioning required to meet Listing 12.05. (Tr. 15). This finding is supported by the opinion of Dr. Singer, who stated that the IQ scores obtained by Dr. Mayfield were inconsistent with plaintiff's adaptive functioning. (Tr. 289). The ALJ noted that plaintiff has worked at a substantial and gainful level in the past as a grass cutter, laborer, and truck driver. (Tr. 15). In fact, the record reveals that plaintiff earned over $28,000.00 in 1991. (Tr. 39). The ALJ pointed out that plaintiff legibly and concisely completed multiple reports in the record, including his Activities of Daily Living report. (Tr. 15). The ALJ noted that plaintiff indicated in his Activities of Daily Living report and in his testimony at the hearing that he cares for his own needs and performs tasks around the house. (Tr. 15, 77-96).

Finally, the ALJ discussed plaintiff's demeanor at the hearing. (Tr. 15). The ALJ noted

that plaintiff presented "clear and logical testimony," and was a "good historian, remembering names and places and dates quite well." (Id.). A claimant's appearance and demeanor at the administrative hearing is a proper factor for an ALJ to consider in determining whether IQ scores are valid. See Clark, 141 F.3d at 1255.

In sum, substantial evidence in the record exists to support the Commissioner's decision that plaintiff did not meet or equal Listing 12.05. First, plaintiff's low IQ scores are the product of a single meeting with a consulting psychologist that occurred when plaintiff had been off of his psychiatric medications for a year. Second, the medical record is not supportive of the low IQ scores found by Dr. Mayfield. Plaintiff's medical records make no mention of any suspected intellectual impairment. Rather, plaintiff's treating sources found that plaintiff was functioning in the low average range of intelligence. Finally, the low IQ scores are inconsistent with plaintiff's adaptive functioning. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed.

# RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for Supplemental Security Income under Title XVI of the Social Security Act be **affirmed**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __13th__ day of July, 2011.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE